**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 89-CR-36-RCL-1** |
| **MICHAEL PALMER,** | |
| *Defendant.* | |

## MEMORANDUM OPINION

Defendant Michael Palmer led an illegal crack cocaine conspiracy in Washington, D.C. during the late 1980s. After a jury found him guilty of drug trafficking and racketeering offenses, he was sentenced to life in prison without parole, the then-mandatory sentence as dictated by statute. Approximately 30 years later, Congress passed the bipartisan First Step Act of 2018,[1] Pub. L. 115-391, 132 Stat. 5194, reducing the statutory penalties associated with crack cocaine distribution. Section 404 of the Act expressly permits district courts to reopen otherwise final convictions and empowers, but by no means obligates, courts to impose a sentence "as if" the reduced crack cocaine penalties had been in effect "at the time of the commission of the offense." *Concepcion v. United States*, __ U.S. __, 142 S. Ct. 2389, 2402 (2022).

Palmer, who has now spent the majority of his life incarcerated, seeks a sentence reduction from this Court through the First Step Act. The government is not altogether opposed. While the parties agree that Palmer is eligible for relief under the Act and that the Court should exercise its discretion to reduce his sentence, they disagree over the appropriate reduced sentence—time served, as Palmer proposes, or 45 years, as the government contends.

---

[1] "The 'First Step Act' is a backronym for the formal title of the Act, which is the Formally Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act." *United States v. Russo*, Nos. 92-cr-351, 90-cr-1063 (FB) __ F. Supp. 3d. __, 2022 WL 17247005 at *1 (E.D.N.Y. Nov. 28, 2022).

After considering the relevant filings and the applicable law, the Court will **GRANT** Palmer's motion. His sentence is reduced to time served, or approximately 34 years.

## I.   BACKGROUND

The factual and procedural background of this case has been described in detail in previous opinions from this Court and the Circuit. *See United States v. Harris*, 959 F.2d 246 (D.C. Cir. 1992) (per curiam); *United States v. Palmer,* 902 F. Supp. 2d 1 (D.D.C. 2012) ("*Palmer I*"); *United States v. Palmer*, 854 F.3d 39 (D.C. Cir. 2017) ("*Palmer II*"); Mem. Op. & Order, *United States v. Palmer*, No. 89-cr-36-1 (RCL) (D.D.C. July 22, 2020), ECF No. 503 ("*Palmer III*"); *United States v. Palmer*, 35 F.4th 841, 844 (D.C. Cir. 2022) ("*Palmer IV*"). The Court includes below an overview of the most salient facts and procedural history for consideration of Palmer's renewed motion on remand.

"Mr. Palmer presided over a large-scale drug business which imported large amounts of cocaine from New York City and distributed it in Washington, D.C. in the late 1980s." *Palmer I,* 902 F. Supp. 2d at 4. Palmer and four co-defendants—Lamar Harris, Richard Smith, Gary Wyche, and Donald Johnson—were charged with various crimes related to the conspiracy. *Harris*, 959 F.2d at 249. In 1989, a jury found Palmer guilty on 12 counts of the indictment, the most significant of which was running a continuing criminal enterprise ("CCE") "involving more than 1500 grams of cocaine base," in violation of 21 U.S.C. § 848. *Palmer IV*, 35 F.4th at 846.

Palmer's sentence for his CCE conviction was subject to a congressionally imposed mandatory minimum. *See id.* Because Palmer was a leader of the enterprise and his conviction involved at least 1,500 grams of cocaine base[2]—or "at least 300 times the quantity of a substance described in" the statute—he was subject to a mandatory sentence of life imprisonment without

---

[2] "Crack cocaine" is a colloquial term for "cocaine base." *See, e.g., United States v. Baugham*, 449 F.3d 167, 183–84 (D.C. Cir. 2006).

the possibility of parole. *See id.* at 845 (quoting 21 U.S.C. § 841(b)(1)(B) (1988)); *see also*

*Dorsey v. United States*, 567 U.S. 260, 263–64 (2012). The Court, following Congress's

command, imposed the mandatory life sentence, plus an additional 20 years for Palmer's other

convictions, to be served concurrently to his life sentence. *Palmer I*, 902 F. Supp. 2d at 5–6.

A Presentence Investigation Report ("PSR") was compiled in preparation for sentencing.

Based on evidence presented at trial, the PSR estimated that Palmer's enterprise distributed more

than 150 kilograms—or 150,000 grams—of cocaine base. *Palmer IV*, 35 F.4th at 846. At

Palmer's sentencing, the Honorable Harold H. Greene noted that Palmer's enterprise distributed

an estimated "100 and 200 kilo[gram]s of crack into the city." *Id.* (quoting Palmer Sent'g Tr. at

9:22–23 (Oct. 18, 1989), ECF No. 391-2).

The Circuit affirmed all 12 of Palmer's convictions on direct appeal. *See id.* at 847 (citing

*Harris*, 959 F.2d at 252–57). Some years later, the Court issued an Amended Judgment reflecting

the fact that 5 of Palmer's convictions had been vacated due to intervening changes in the law on

merger of offenses but leaving his CCE conviction and life sentence unchanged.[3] *See* Am. J.,

ECF No. 426. Palmer has now completed serving all of his sentences except for the life

sentence.[4] Def.'s Suppl. on Remand, ECF No. 550, at 4 n.3.

In 2019, Palmer moved for a sentence reduction pursuant to § 404 of the First Step Act.

*See* Def.'s Mot., ECF. No. 475; Def.'s Suppl. Mot., ECF. No. 483. The government opposed,

Gov't Opp'n, ECF No. 492, and Palmer replied, Def.'s Reply, ECF No. 494. This Court initially

denied Palmer's First Step Act motion, concluding that he was ineligible for relief under § 404 of

---

[3] The Amended Judgment was the result of a consolidation and partial granting of several post-conviction motions filed by Palmer pursuant to 28 U.S.C. § 2255. *Palmer IV*, 35 F.4th at 847. The Circuit affirmed the Amended Judgment on appeal. *See United States v. Palmer*, 854 F.3d 39, 41–42 (D.C. Cir.), *cert. denied*, __ U.S. __, 138 S. Ct. 286 (2017).

[4] Palmer is currently incarcerated at U.S. Penitentiary ("USP") McCreary in Pine Knot, Kentucky. *Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Feb. 22, 2023).

the Act based on the *actual quantity* of illegal narcotics involved in his offense conduct, which

would have continued to support a life sentence under both the current and previous versions of

21 U.S.C. § 848. *Palmer III* at 9. The Court also conducted an analysis of the sentencing factors

in 18 U.S.C. § 3553(a) and determined that, even if Palmer were eligible, the Court would not

exercise its discretion to reduce his sentence. *Id.* at 9–11. Five months after this Court ruled on

Palmer's First Step Act motion, the Circuit decided *United States v. White*, holding that a

defendant's eligibility for First Step Act relief turns solely on whether the Fair Sentencing Act

modified the *statutory quantity* involved in the defendant's conviction and that a court considers

the actual quantity as part of its § 3553(a) analysis. 984 F.3d 76, 87 (D.C. Cir. 2020).

On appeal, the Circuit, relying on *White*, determined that Palmer was eligible for relief

under the First Step Act based on the quantity of drugs listed in his statute of conviction. *Palmer*

*IV*, 35 F.4th at 850. The Circuit remanded the case to this Court to clarify the current applicable

statutory baseline penalty for Palmer based on the drug quantity listed in the statute of conviction

and once again determine whether to grant or deny the requested relief based on the § 3553(a)

sentencing factors. *Id.* at 852–53.

On remand, the parties filed supplements to their pleadings focusing on the § 3553(a)

analysis. Palmer urges this Court to reduce his sentence to time served, or 34 years. Def.'s Suppl.

on Remand at 1. He insists that he "is not the same immature and irresponsible person he was in

his twenties" when he was sentenced due to his substantial rehabilitation, among other factors.

Def.'s Reply on Remand, ECF No. 559, at 7. The government, while acknowledging and

crediting Palmer's rehabilitation, still insists that the Court should only reduce Palmer's life

sentence to 45 years because of the serious nature of the offense and Palmer's disciplinary

history while incarcerated. Gov't Opp'n on Remand, ECF No. 558, at 21–22. Palmer's motion is

ripe for review.

## II.   LEGAL STANDARD

"For nearly 25 years, federal criminal law punished offenses involving crack cocaine far

more harshly than offenses involving powder cocaine." *United States v. Lawrence*, 1 F.4th 40, 42

(D.C. Cir. 2021). In 2010, "Congress reduced, but did not eliminate, the crack-to-powder

disparity in the Fair Sentencing Act," by "reduc[ing] the disparity between cocaine base and

powder cocaine from 100-to-1 to 18-to-1." *Id.* (internal citations omitted). Specifically, Section 2

of the Act increased the threshold drug amounts required to trigger mandatory minimum

sentences for crack offenses. 124 Stat. at 2372 § 2. Before the Act, distributing 5 grams of crack

cocaine triggered a 5-year mandatory minimum. *Id.* The Act increased that threshold to 28

grams. *Id.* This modification, in turn, increased the minimum quantity of crack cocaine required

to mandate a term of life imprisonment under 21 U.S.C. § 848 from 1,500 grams (300 times 5

grams) to 8,400 (300 times 28 grams). *Palmer IV*, 35 F.4th at 846. However, those revisions

initially did not apply to defendants sentenced before August 3, 2010, the date of the Fair

Sentencing Act's enactment. *See id.* (citing *Terry v. United States*, __ U.S. __, 141 S. Ct. 1858,

1861 (2021)).

Eight years later, Congress passed the First Step Act. *Id.* (citing 132 Stat. at 5194).

Section 404 of the First Step Act made retroactive the Fair Sentencing Act's modifications. It

"allows district courts to consider intervening changes of law or fact in exercising their discretion

to reduce a sentence pursuant to the First Step Act," so long as they "explain their decisions and

demonstrate that they considered the parties' arguments." *Concepcion*, 142 S. Ct. at 2404.

In considering Palmer's motion, the Court follows the Circuit's instruction in *White*, which "provides our Circuit's framework to evaluate First Step Act motions." *Palmer IV*, 35 F.4th at 850. The Circuit explained that a district court evaluating a Section 404 motion must follow a two-step process:

> First, under section 404(a), the court must determine whether a defendant is eligible for relief—that is, whether the movant committed a "covered offense," defined as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 . . ., that was committed before August 3, 2010." First Step Act § 404(a), 132 Stat. at 5222. . . .
>
> Second, under section 404(b), a "court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect at the time the covered offense was committed." First Step Act § 404(b), 132 Stat. at 5222. Put simply, once a defendant is considered eligible, the district court exercises its "broad discretion" to decide "whether it should reduce the sentence." *White*, 984 F.3d at 88 (quoting *United States v. Hudson*, 967 F.3d 605, 610 (7th Cir. 2020)); see also First Step Act § 404(c) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."), 132 Stat. at 5222.

*Id.*

## III.   DISCUSSION

### A. Palmer Is Eligible for Resentencing Under the First Step Act

A jury convicted Palmer of leading a crack cocaine conspiracy that distributed at least 1,500 grams of crack cocaine in violation of 21 U.S.C. § 848(b). The statute provides that anyone who is a "principal administrator, organizer, or leader" of a CCE that "involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title," "shall be imprisoned for life." 21 U.S.C. § 848(b). Section 2(a) of the Fair Sentencing Act increased the threshold quantity in 21 U.S.C. § 841(b)(1)(B) necessary to trigger certain mandatory minimum penalties. With the retroactive application of the Fair Sentencing Act through the First Step Act,

8,400 grams—rather than 1,500 grams—became the minimum quantity necessary to trigger the mandatory life sentence under 21 U.S.C. § 848(b).

Because Palmer's statute of conviction was modified by the Fair Sentencing Act, and his offense occurred prior to August 3, 2010, he committed a covered offense, and is thus eligible for relief under § 404 of the First Step Act.

### B. This Court Will Reduce Palmer's Sentence

When determining whether an eligible defendant should be granted First Step Act relief, some important factors for a district court to consider are: "*new statutory minimum or maximum penalties*; current [Sentencing] Guidelines; post-sentencing conduct; and other relevant information about a defendant's history and conduct." *Palmer IV*, 35 F.4th at 851 (emphasis in original) (citing *White*, 984 F.3d at 90). Further, courts "may consider other intervening changes of law (such as changes to the Sentencing Guidelines) or changes of facts (such as behavior in prison) in adjudicating a First Step Act motion" and are "obligated to consider nonfrivolous arguments presented by the parties" but are "not compel[led] . . . to exercise their discretion to reduce any sentence based on those arguments"). *Concepcion*, 142 S. Ct. at 2396. The overall purpose of the resentencing inquiry, like an original sentencing, is to ensure that the sentence is "sufficient, but not greater than necessary, to fulfill the purposes of [18 U.S.C.] § 3553(a)." *Palmer IV*, 35 F.4th at 851 (alteration in original) (citing *White*, 984 F.3d at 90).

Palmer requests a sentence reduction to time served, now approximately 34 years. The government does not oppose a sentence reduction but argues that the Court should only reduce Palmer's sentence to 45 years' incarceration.[5] The Court agrees with both parties that a sentence

---

[5] The government maintains that his current term of 5 years of supervised release remains appropriate. Gov't Opp'n on Remand at 2. Palmer's filings do not take a position on the government's request. Therefore, the Court does not make any determination about a possible reduction in Palmer's supervised-release term.

reduction is warranted based on an analysis of the new statutory minimum and maximum penalties, current Guidelines, and the relevant sentencing factors listed in 18 U.S.C. § 3553(a). Furthermore, the Court agrees with Palmer that 34 years in prison is a more appropriate sentence than another decade of incarceration.

### 1.  New Statutory Minimum or Maximum Penalties

As the Circuit implicitly held, Palmer would face a new statutory minimum penalty were he to be sentenced today. At the time of Palmer's conviction, the mandatory minimum sentence for a defendant convicted of leading a CCE involving at least 1,500 grams of crack cocaine was life imprisonment. *Palmer IV*, 35 F.4th at 851. Today, a 21 U.S.C. § 848(b) conviction involving at least 8,400 grams of crack cocaine carries a mandatory minimum sentence of 20 years and a maximum of life imprisonment. 21 U.S.C. § 848(a). Therefore, 20 years "is the correct mandatory minimum for [this Court] to use in deciding whether to impose a reduced sentence for Palmer's CCE offense under the First Step Act." *Id.* at 852.

In the years since Palmer's conviction, Congress lowered the mandatory minimum applicable to Palmer's case from life without parole to 20 years. Therefore, the reduced statutory minimum penalty weighs in favor of a sentence reduction.

### 2.  Current Sentencing Guidelines Range

Today, the penalties for drug-related felonies are calculated using the drug quantity table listed in the U.S. Sentencing Guidelines Manual. *See* U.S.S.G., ch. 2, pt. D § 2D1.1 (U.S. Sent'g Comm'n 2021); *see also Dillon v. United States*, 560 U.S. 817, 821 (2010). Courts "may consider both judge-found and jury-found drug quantities" in determining the applicable drug quantity for Guidelines calculations. *Palmer IV*, 35 F.4th at 851 (citing *White*, 984 F.3d at 88). Under the current Guidelines, an offense involving 25.2 kilograms of crack cocaine triggers the highest base

offense level. U.S.S.G. § 2D1.1(c). Palmer argues that the Court should start its Guidelines calculation from a much lower base offense level because the only applicable quantity is the jury-found 1,500 grams—or 1.5 kilograms—of crack cocaine implicated in his 21 U.S.C. § 848 conviction. Def.'s Suppl. on Remand at 17. Moreover, Palmer rejects as judge-found the 2 quantities cited by this Court in its initial denial of his motion: 1) the PSR's calculation of 150 kilograms of crack cocaine and 2) Judge Greene's statement at his sentencing that Palmer's conspiracy distributed "between 100 and 200 kilo[gram]s of crack" cocaine. *Id.* at 17–18. Palmer claims that neither of those quantities are judge-found because they are not "particularized findings" "as to the scope of Palmer's agreement or the basis on which a particular quantity of drugs was reasonably foreseeable to him." Def.'s Reply on Remand at 2–3 (citing *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995)). The government argues that the quantities stated in the PSR and by Judge Greene are judge-found and therefore it is proper for the Court to consider both quantities. Gov't Opp'n on Remand at 15–16 (citing *United States v. Toms*, 136 F.3d 176, 187 (D.C. Cir. 1998)). The Circuit determined that it would "leave it to the district court to address in the first instance whether [those] quantities qualify as 'judge-found' under *White*." *Palmer IV*, 35 F.4th at 852 n.5 (citing *White*, 984 F.3d at 88).

The Court agrees with Palmer in part and the government in part. Judge Greene's comment at sentencing, standing alone, is not a proper judge-found quantity, nor is it clear from the record that Judge Greene incorporated the PSR's findings in delivering Palmer' sentence. Regardless, the record plainly supports a judicial finding that Palmer was responsible for at least 150 kilograms of crack cocaine, far more than the 1,500 grams listed in the then-applicable version of 21 U.S.C. § 848. The Court will address each point in turn.

At the sentencing for Lamar Harris, one of Palmer's co-defendants, held earlier on the same

day as Palmer's sentencing, Judge Greene stated:

> The evidence, as I heard it, shows that the conspiracy . . . that Mr. Palmer headed
> . . . operated for some two to three years. It sold an estimated 1 to 2 kilos of crack
> per week, or 100 to 200 kilos for the entire period.

Harris Sent'g Tr. at 2:9–15, ECF No. 391-1.

At Palmer's sentencing, Judge Greene added:

> I have discussed in some detail both in general and specifically as to the various
> defendants what this criminal enterprise headed by Mr. Palmer did. There would
> be no point in repeating all of that. Suffice it to say that the conspiracy brought
> between 100 and 200 kilos of crack into this city; sold it in several neighborhoods;
> [and] created or supported hundreds, if not thousands, of addicts[.]

Palmer Sent'g Tr. at 9:18–24.

Read in context, Judge Greene's statements regarding the "between 100 and 200

kilo[gram]s of crack," repeated during the sentencings for multiple defendants with different roles

in the conspiracy, clearly reference the quantity attributable to the conspiracy as a whole. The

statement speaks of the entire period in which the conspiracy operated, of which Palmer only

participated during a portion. The government nevertheless argues that Judge Greene's statement

was a "factual finding based on credible evidence" because it was based on trial testimony,

described the scale of the conspiracy's crack cocaine distribution, and referenced Palmer as the

conspiracy's leader. Gov't Opp'n on Remand at 14. But the government's argument runs contrary

to established caselaw. Palmer's label as the leader of the conspiracy does not obviate the need for

the district court make individualized findings regarding "the scope of his agreement to the

conspiratorial conduct and the foreseeability of his co-conspirators' conduct." *See United States v.*

*Wyche,* 741 F.3d 1284, 1292 (D.C. Cir. 2014) (internal citations and quotations omitted). The

government's assertion is further belied by the record. In response to an earlier post-conviction

motion by Palmer, the government admitted that the sentencing statement was an example of Judge

Greene speaking "in general terms about the conspiracy." Gov't Opp'n to Def.'s Mot. to Vacate, ECF No. 391, at 3. And the Circuit previously characterized this comment as just an "observation."[6] *Palmer II*, 854 F.3d at 50.

However, the PSR plainly made particularized findings regarding Palmer. Examination of the record in Palmer's case and the records for co-defendants Gary Wyche and Richard Smith illustrates this point. Wyche was a member of the conspiracy for nearly 9 months and his PSR recounted trial evidence showing that, during that period, the group distributed approximately 907.2 grams of cocaine base per week. *Wyche*, 741 F.3d at 1294. Therefore, using that time frame and quantity, Wyche's PSR attributed approximately 31 kilograms of cocaine base to him. *Id.* The PSR for co-defendant Richard Smith attributed approximately 22 kilograms of cocaine base to him. *Id.* at 1291. That figure was calculated by multiplying Smith's time in the conspiracy (approximately 6 months) by the quantity of cocaine base distributed per month during the time that Smith participated (approximately 4 kilograms). *Id.* Palmer was a member of the conspiracy "from January 1987 until July 1988" and "testimony indicated the group [sold] two pounds of cocaine base every two to three days" during this period. Gov't Opp'n on Remand at 3 (citing PSR ¶ 16). Based on these calculations, the PSR estimated "that the group distributed in excess of 150 kilograms of cocaine base" during Palmer's involvement. *Id.* (citing PSR ¶ 16). Therefore, the Court considers the quantity determined by the PSR—150 kilograms of cocaine base—as the minimum actual quantity of drugs involved in Palmer's case.[7]

---

[6] Palmer further argues that Judge Greene's comment is not a proper judge-found quantity because it was made after he imposed the sentence. Def.'s Suppl. on Remand at 18. The Court is not aware of any caselaw supporting such a narrow interpretation of a sentencing court's broad ability to determine a drug quantity for a Guidelines calculation during a sentencing proceeding, or holding in any context that a sentencing court must articulate every detail of its reasoning *before* stating what the sentence is. Therefore, the Court rejects this argument.

[7] Palmer also argues that neither the PSR not Judge Greene's comments can qualify as factual findings with respect to the quantity of crack cocaine attributable to Palmer because the conspiracy primarily distributed powder cocaine and other drugs. Def.'s Suppl. on Remand at 19–20. However, as the government correctly notes, this argument is "without merit" because it is both procedurally defaulted for failure to raise on direct appeal and it is also

Based on the Court's review of Palmer's sentencing transcript, Judge Greene did not explicitly adopt the PSR's findings.[8] It is possible that he implicitly incorporated the PSR's 150-kilogram estimation at Palmer's sentencing, as this quantity falls "between 100 and 200 kilo[gram]s" when the PSR's quantity of drugs sold weekly is multiplied by Palmer's time in the conspiracy.[9]

Regardless, out of an abundance of caution, this Court will "make an independent drug quantity finding," as it is permitted to do, because "it cannot determine [Palmer's] amended guideline range without doing so." *Wyche*, 741 F.3d at 1293. A district court may base its drug quantity finding "on any ground supported in the record," *United States v. Miller*, 890 F.3d 317, 328 (D.C. Cir. 2018) (quoting *United States v. Taylor*, 627 F.3d 674, 676 (7th Cir. 2010)), but "a resentencing court's quantity finding cannot be inconsistent with factual determinations made by the original sentencing court." *Wyche*, 741 F.3d at 1293 (citing *United States v. Kennedy*, 722 F.3d 439, 442 (D.C. Cir. 2013)).

The PSR estimated that Palmer's offense involved approximately 150 kilograms of crack cocaine. This calculation was based on the testimony of more than 50 witnesses during a 2-week trial. Gov't Opp'n to Def.'s 28 U.S.C. § 2255 Mot., ECF No. 276, at 1. These witnesses testified that Palmer's associates transported at least one kilogram of crack cocaine from New York to Washington, D.C. every couple of days during the time Palmer participated in the conspiracy. *See,*

---

contradicted by trial evidence. *See* Gov't Opp'n on Remand at 14 n.5; *see also* Gov't Opp'n to Def.'s 28 U.S.C. § 2255 Mot., ECF No. 276, at 86 ("As the Court observed midway through the trial, "[w]e have had crack all over the place") (citing Trial Tr. at 97 (July 7, 1989)).

[8] Even if Judge Greene had, this adoption alone would not be sufficient to establish a judge-found quantity of 150 kilograms, because it is well-settled that a district court does not satisfy the requirement to particularized findings of drug quantities attributable to a defendant "simply by adopting the presentence report." *United States v. Thomas*, 114 F.3d 228, 255 (D.C. Cir. 1997).

[9] This logic holds only if one is to assume that: a) the "between 100 and 200 kilo[gram]s" statement was specific to Palmer, even though, as discussed above, Judge Greene repeated the same comment at the sentencings for Palmer's co-defendants; and b) the PSR's use of "pounds" as the weekly cocaine base unit of measurement was in error and that the proper weekly unit, consistent with Judge Greene's statement, was "kilograms."

*e.g.*, Trial Tr. at 155–56 (June 29, 1989); Trial Tr. at 220–22 (June 30, 1989); Trial. Tr. at 46–99 (July 6, 1989). A witness described the scene of an apartment storing the illegal drug supply as "like wall-to-wall cocaine." Trial Tr. at 125 (July 7, 1989). Palmer's organization sold crack cocaine nearly every day. Trial Tr. at 155–56 (June 29, 1989). Multiple people distributed crack in various sizes and quantities. *Id.* at 149–50 (50-gram bags); Trial Tr. at 182–83 (June 29, 1989) (half-gram bags); Trial Tr. at 79–80 (June 27, 1989) (bags valued at $50). All of this evidence led Judge Greene, who presided over the trial, to conclude: "In the 25 years . . . that I have been on the bench, I have seldom, if ever, seen a case in which the evidence was as overwhelming as it was in this case . . . and particularly [as to] the guilt of Mr. Palmer." *Palmer IV*, 35 F.4th at 846–87 (quoting Palmer Sent'g Tr. 7:7–13). Based on this evidence, the Court finds that the PSR's estimation that Palmer was responsible for at least 150 kilograms of crack cocaine is amply supported by the record and is not inconsistent with Judge Greene's observations. *Miller,* 890 F.3d at 328; *Wyche,* 741 F.3d at 1293.

The Court can, and does, consider the 150-kilogram figure as a proper judge-found quantity in its calculation of Palmer's Guidelines sentence. Because his offense clearly involved more than 25.2 kilograms of crack cocaine, were he sentenced today, his conduct would warrant the highest base offense level under the current Guidelines—38. The parties agree that his base offense level would be raised due to enhancements for being a leader of a criminal activity involving five or more participants, restraint of a victim,[10] and obstruction of justice.[11] *See* Def.'s Suppl. on Remand at 21; Gov't Opp'n on Remand at 16 & n.7. Even though the enhancements would raise his base

---

[10] Evidence at trial established that Palmer and others beat, threatened, and held a rival drug dealer captive at gunpoint for a week. *See* Gov't Opp'n on Remand at 3–4 (citing PSR ¶¶ 14, 35).

[11] After his arrest, Palmer directed a witness not to cooperate with the police investigation into the conspiracy. *See id.* at 3–4 (citing PSR ¶¶ 20, 36).

offense level by a total of 8 points,[12] the maximum base offense level under the current Guidelines is 43.[13] *See* U.S.S.G. ch. 5 pt. A. Therefore, Palmer's total offense level would be 43. With Palmer's criminal history,[14] his recommended sentence under the current Guidelines would be 360 months, or 30 years, to life imprisonment. *See* U.S.S.G. ch. 5 pt. A.

The current Guidelines would support a possible life sentence for Palmer were he to be sentenced today. Moreover, consideration of the staggering actual quantity of drugs involved in the offense, along with the nature of the applicable enhancements, suggests to the Court that a Guidelines sentence higher than the minimum 30 years would be appropriate. Therefore, examination of the Guidelines range alone does not favor a sentence reduction.

### 3.  18 U.S.C. § 3553(a) Factors

This Court acknowledges that, 3 years ago, this Court determined that, even if Palmer were eligible for resentencing, an analysis of the sentencing factors in 18 U.S.C. § 3553(a) would not warrant a sentence reduction in Palmer's case. *See Palmer III* at 9–11. But that determination was made prior to the Circuit's decision in *White* and the Supreme Court's decision in *Concepcion*, both of which clarified the nature and scope of the § 3553(a) inquiry in a First Step

---

[12] Specifically, Palmer's base offense level would be raised by the following: 4 points (leader of a criminal activity involving five or more participants); 2 points (restraint of a victim), and 2 points (obstruction of justice). *See* U.S.S.G. ch. 3, pt. A § 3A1.3 (U.S. Sent'g Comm'n 2021); *id.* pt. B § 3B1.1(a); *id.* pt. C § 3C1.1.

[13] Palmer argues that the current Guidelines would not support the additional 3-level enhancement for official victim applied by the sentencing court in reference to co-conspirator's non-fatal shooting of a police officer. *See* Def.'s Suppl. on Remand at 20–21 (referencing U.S.S.G. ch. 3, pt. A § 3A1.2). The government disagrees with Palmer's characterization, insisting that the enhancement remains appropriate, and argues in the alternative that Palmer would still be subject to a different victim-related enhancement. Gov't Opp'n on Remand at 16. The Court need not resolve this issue because the enhancements that the parties agree apply already exceed the maximum offense level.

[14] The PSR assigned Palmer a criminal history category of IV based on previous convictions and his commission of the instant offense fewer than 2 years after his release from incarceration on a separate conviction. *See* Def.'s Suppl. on Remand at 21–22. Palmer argues that, under the current Guidelines, he would instead be assigned a criminal history category of III, because Amendment 742 to the Guidelines, implemented after Palmer's sentencing, eliminated the practice of enhancing a defendant's criminal history category based on a recent prior conviction. *Id.* at 22. The government does not appear to take a position on this matter. *See* Gov't Opp'n on Remand at 16 & n.8. Nor does this Court. A base offense level of 43 results in the same recommended Guidelines range (360 months to life) regardless whether the defendant has a criminal history category III or IV. *See* U.S.S.G. ch. 5, pt. A.

Act resentencing. Analyzing the § 3553(a) factors with the benefit of those cases, as well as a consideration of the additional evidence and argument submitted by Palmer on remand, the Court reaches a different decision today. Thus, the Court concludes that a sentence reduction is warranted in Palmer's case.

       a. *Nature and Circumstances of the Offense and the Need for the Sentence Imposed*

As the Circuit recognized, this Court has already opined on the nature and circumstances of the offense and the need for the sentence imposed. *See Palmer IV*, 35 F.4th at 848, 853 (citing 18 U.S.C. §§ 3553(a)(1), (2)). The Court will not repeat its analysis here except to underscore the severity of Palmer's crimes, summarized by Judge Greene as the following:

> The evidence, as I heard it, shows that the conspiracy . . . that Mr. Palmer headed was a maligned presence in the District of Columbia for a substantial period. . . .
>
> They supplied thousands of men, women and children with crack. They did this with a large and sophisticated organization, with Palmer as its head and the other four defendants who are before the Court today as lieutenants, with many runners doing hand-to-hand sales.
>
> The amount is only part of it. Juveniles were used on some substantial scale in the distribution of this cocaine. The members of the conspiracy possessed many weapons. Twenty-seven firearms were recovered by the police - and there must have been others that were not recovered - including a machine gun and submachine guns. The defendants were not reluctant to use the weapons. They periodically shot up the courtyard at the Mayfair-Paradise apartments to establish and maintain control, and for weeks and months they were masters of that apartment complex.

Harris Sent'g Tr. at 2:9–3:15.

The nature and circumstances of the offense strongly militate against a sentence reduction. However, as will be explained further, the additional § 3553(a) sentencing factors, and particularly Palmer's post-sentencing conduct, convince this Court that a sentence reduction is appropriate.

  b.  *History and Characteristics of the Defendant*

In describing Palmer's history and characteristics, the government's filing focuses on his criminal history, both the instant offense and his prior convictions. Gov't Opp'n on Remand at 16–17. But as Palmer's filing makes clear, his religious devotion, remorse, and acceptance of responsibility appear to this Court to be more representative of his current character. An inquiry into Palmer's present characteristics is important because in a resentencing, the Court must consider the defendant as he appears today, "not on the date of his offense or the date of his conviction." *Concepcion*, 142 S. Ct. at 2396 (citing *Pepper v. United States*, 562 U.S. 476, 491 (2011)).

Palmer grew up in a religious household, though he strayed from his faith during his youth. Def.'s Mot. on Remand at 3. Shortly after he began serving his sentence, Palmer sought guidance from the prison chaplain. Palmer Letter (Jan. 24, 2019), ECF No. 475-1, at 2. The chaplain encouraged him "to educate [him]self, go to school, [and] study the Bible." *Id.* Inspired by the chaplain, Palmer reconnected with his faith. He was baptized 2 years into his incarceration and with that act, renewed his spiritual life and identity. *Id.* Practicing his Christian faith is now a primary pillar of his life. Palmer Letter (June 13, 2022), ECF No. 550-1, at 4; Mencher Letter, ECF No. 550-3, at 4; Vasquez Letter, ECF No. 550-3, at 15. A fellow inmate notes that Palmer "is now a beacon of hope and light in the sea of despair which is ground in his faith and God." Wright Letter, ECF No. 550-3, at 2. Another inmate describes Palmer as "a spiritual mentor" who has "taught [him] to ask God for help [in] decision[-]making." Ridley Letter, ECF No. 550-3, at 5. Yet another represents that he has "grown closer to God from watching how [Palmer's] faith has assisted with [Palmer's] trust in [God] and worrying about nothing else." Maddox Letter, ECF No. 550-3, at 12. Even people outside the walls of prison have recognized this

transformation. His childhood friend, who is not incarcerated, observes that "[Palmer] has grown spiritually and emotionally over the years." Raynor Letter (June 13, 2022), ECF No. 550-2, at 1.

Guided by his faith, Palmer consistently accepts responsibility for his criminal activities in letters to his Court.[15] Palmer Letter (Oct. 6, 2019), ECF No. 496-1, at 2; Palmer Letter (Jan. 24, 2019); Palmer Letter (June 13, 2022). With the benefit of several decades of reflection, Palmer states that his criminal past, of which he is "not proud," resulted because he "lost sight of the fundamental principles [his] mother tried so very hard to bestow on [him:] . . . [h]ard work, dedication, and sacrifice, [] what ou[r] society is built on." Palmer Letter (Oct. 6, 2019) at 2. Palmer is "truly and deeply sorry" for his "shameful conduct" and "apologize[s] to this court, to the community and to the families [he hurt] as well as [his] family . . . whom [he] ha[s] brought disgrace to." *Id.* In another letter, Palmer reiterates that he is "very very very very sorry" and says that "[t]here is not a day [that] go[es] by [that he is] not in pain and misery for [his] stupid choices." Palmer Letter (June 13, 2022) at 1.

The Court need not merely take Palmer's own word as evidence of his remorse and acceptance of responsibility—more than a dozen letters from Palmer's family, friends, and supporters detail his public acknowledgment of the same. Palmer's older brother, a physician assistant, writes: "From our many conversations, I know that he is filled with deep regret over the path he chose many years ago." McCulloch Letter, ECF No. 475-1, at 3. Palmer's friend notes that "in all of the years that I have been in contact with him he has never blamed anyone for his incarceration" and that "[h]e accepts that he got himself into this situation because of the bad choices he made." Raynor Letter at 1. Inmates who know Palmer describe how he "talks to

---

[15] In fact, Palmer's acceptance of responsibility first manifested before his conviction. He and most of his co-defendants attempted to plead guilty prior to trial but, but because his plea was wired and his co-defendant Smith declined to plead guilty, the group went to trial. *See* Def.'s Suppl. on Remand at 7 n.6.

us younger guys and expresses how sorry he is for his stupid choices in his younger day[s]" and that "he want[s] to use his life to show my generation that crime [doesn't] pay." *See* Moseby Letter, ECF No. 550-3, at 11; Johnson Letter, ECF No. 550-3, at 17. That Palmer has expressed his remorse and acceptance of responsibility to multiple individuals on different occasions is further evidence that his feeling is genuine.

Finally, it is encouraging to see that Palmer shares his story as a cautionary tale those who might be vulnerable to the same impulses that fueled his criminal behavior and discourages them from such activity. In a letter to the Court, one nonprofit organization recounts a program during which Palmer spoke to young students and encouraged them to "understand why it is important to make the right choices in life, and the consequences of the wrong choices." Newkirk Letter, ECF No. 550-6. That he seeks to prevent today's youth from destroying their own lives further suggests a spiritual and personal evolution.

Palmer's immense spiritual growth and public acknowledgment of his past wrongs to this Court and others leans in favor of a sentence reduction.

### c.   *Defendant's Post-Sentencing Conduct*

As the Supreme Court has instructed, "in deciding whether to grant First Step Act motions and in deciding how much to reduce sentences," district courts may "look[ ] to postsentencing evidence of violence or prison infractions as probative." *Concepcion*, 142 S. Ct. at 2403; *see also Pepper*, 562 U.S. at 491 ("[E]vidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing."). Judges in this District have given post-sentencing conduct "substantial weight." *See United States v. White*, Crim. No. 93-97 (BAH), 2022 WL 3646614 at *22 (Aug. 24, 2022).

Even though Palmer "fac[ed] a lifetime in prison" with "no realistic expectation that he would ever be released," he participated in an impressive number of educational and personal development programming opportunities. Def.'s Suppl. on Remand at 4, 10–11. In terms of education, Palmer earned his GED and completed more than 200 programs, including all of the college courses offered to inmates by Newport College, on topics such as financial accounting, business law, business mathematics, marketing, real estate, sales management, and professional development. *Id.* at 10–11; Newport Coll. Bus. Inst. Certificates, ECF No. 475-1, at 14, 18–19; Palmer Educ. Data, ECF No. 550-5. He successfully completed a six-year nonresidential drug abuse treatment program. Whitmire Mem., ECF No. 475-1, at 14. Palmer's instructor in that program remarks that he was "impressed with [Palmer's] thirst for knowledge and desire for self-improvement." *Id.* Additionally, Palmer successfully completed the Challenge program, a nine-month intensive experience focusing on criminal and substance abuse rehabilitation. Contri Mem., ECF No. 475-1, at 7. Due to the demanding standards of the program—including "a zero-tolerance policy for drugs, alcohol, and violence"—just 30 percent of participants who start the program successfully complete it. *Id.* Not only did Palmer complete the program, he chose to remain on the unit after his formal completion. *Id.* at 8. Palmer was taught dog handling and training during the Challenge program, and he later employed those skills to train therapy dogs. Def.'s Reply on Remand at 5; Ex. B (Photographs), ECF No. 559-2.

In addition to his own self-improvement through education and programming, Palmer has worked to educate and help others. While at U.S. Penitentiary ("USP") Lewisburg, Palmer was selected as one of only 22 inmates to serve as a member of the Psychology Services' Suicide Watch Companion Team. Karpen Mem., ECF No. 494-1, at 7. Selection required a "demonstration of superior institutional adjustment" through a multi-step screening process, and "final selections

[we]re based upon the demonstration of maturity, responsibility and commitment to the well-being of fellow inmates." *Id.* After Palmer's transfer to USP Allenwood, he applied for and was accepted to be a member of that facility's suicide watch team. Mitchell Rep., ECF No. 475-1, at 5–6. In addition to formal relationships with other inmates through suicide watch teams, Palmer serves as an informal mentor to many on the inside. More than a dozen inmates wrote letters expressing to the Court the various ways that Palmer helped them to take responsibility for their actions and commit to self-improvement. *See generally* Inmate Letters, ECF No. 550-3. His actions have had a positive impact beyond the prison community. One of the inmates Palmer worked with on legal research has since been released from prison and is the owner of his own paralegal business. *See* Walker Letter, ECF No. 550-4.

Along with educational, programming, and mentorship pursuits, Palmer developed a number of vocational skills while incarcerated. He successfully completed an apprenticeship program through the Department of Labor for commercial house cleaning and received certifications in general industry safety and health standards as promulgated by the Occupational Safety and Health Administration. *See* Certifications, ECF No. 475-1, at 16, 21–24. He obtained other professional certifications to work as a cook, physical trainer, construction worker, and pest control technician. Palmer Letter (June 13, 2022) at 3. An official at USP Allenwood, who employed Palmer for 6 years and has known him for twice as long, says that Palmer "is a self-motivated individual who completes his work requirements without being asked." Seiler Mem., ECF No. 475-1, at 10. His supervisor at the USP Lewisburg law library echoes that Palmer "has shown [an] exceptional attitude towards work" and that "[he] has continued to follow every order or guidance given to him." Hummel Mem., ECF No. 475-1, at 15. The chief psychologist at USP Allenwood writes that Palmer "has marketable skills, [and] a sound work ethic" "to assist in his

return to society." Mitchell Rep. at 6. The Court finds such statements, rendered by neutral prison officials, particularly helpful for determining Palmer's current character.

Palmer's commitment to improving his relationships with his family during his incarceration is particularly estimable. Based on the representations to the Court by Palmer and his family members, he works tirelessly to assist and encourage his children even from behind bars. Palmer's younger daughter, who was born ten days after his arrest, is now a medical doctor. Taylor Palmer, *Can My Daddy Come Home Now?*, CLEMENCY REP. (Sept. 16, 2014), ECF No. 480-1, at 71. She describes how Palmer served as an emotional and academic support system for her throughout her life. *Id.* at 72–73. He even requested a transfer to USP Allenwood so that he would be nearby as she attended Temple University. Palmer Letter (June 13, 2022) at 4. His older daughter, who was two years old when Palmer went to prison, paints a similar picture of a supportive father. Elan Palmer Letter, ECF No. 493, at 1. She notes that, even from prison, Palmer helped her with her homework from elementary school through college, where she earned her degree and now works as a teacher. *Id.* at 1–2. His wife recounts that Palmer "carried me through stage II breast cancer" and that his "letters, phone calls, paintings, and tireless nights of continual praying during my time on chemo kept me hopeful that I had more to live for and that I would beat cancer." Robyn Taffe-Palmer Letter, ECF No. 493, at 4. She adds that "we are all rooting for Michael and would love nothing more than for him to return home to us."[16] *Id.*

Palmer speaks publicly about his commitment to his own family and leads by example, encouraging others to support their own families. A drug treatment specialist at USP Lewisburg

---

[16] In an earlier, *pro se* filing, Palmer states that he plans to live with his brother and sister-in-law in New York upon release. Palmer Letter (Oct. 6, 2019) at 2. But in a later, counseled filing, Palmer notes that he is not a U.S. citizen and is subject to deportation upon release. Def.'s Suppl. on Remand at 25 (citing Palmer Reentry Plan, ECF No. 494-1, at 11). Any uncertainty in Palmer's post-release living arrangement does not affect the Court's determination that a sentence reduction to time served, resulting in his impending release, is appropriate here.

"heard him express strong family values" "[o]n many occasions." Whitmire Mem. at 6. Palmer's

cousin describes how Palmer "has inspired" her "to raise [her] sons in a manner that respects the

law, people[,] and take part in the community." Kim Simpson-Turnbull Letter, ECF No. 499, at

1. Numerous fellow inmates explain how Palmer's focus on his own family serves as an example

to them to rebuild relationships with their own family members. *See, e.g.*, Pierce Letter, ECF No.

550-3, at 7 (Palmer is "[a]lways telling us to educate oursel[ves] and to build a strong

relationship with our children and family"); Maddox Letter at 12 ("[Palmer] has help[ed] me

develop into a better man, father, son and a role model for those who look up to me as well");

Vasquez Letter at 15 ("The main thing that Mr. Palmer and I talk about are family values. We

talk about how to maintain a relationship with our family. Especially with our children"); Pierre-

Louis Letter, ECF No. 550-3, at 16 ("[A]lthough Mr. Palmer has been incarcerated for over 30

years he maintained a strong relationship[] with his kids. [T]he[ir] bond as a family is

undeniable, [and] it's because of Mr. Palmer. I understand and realize that regardless of my

circumstances, I still can be an anch[o]r in my kids['] life").

The only blemish on Palmer's otherwise exemplary post-sentencing record is his

disciplinary history. Over the 3 decades of Palmer's incarceration, he has committed more than

20 infractions, 9 of which involved violence. Palmer Disciplinary Rep., ECF No. 558-1. The vast

majority of his violent infractions—7 in total—occurred within Palmer's first decade in prison.

*Id.* at 2–7. Palmer explains that these incidents were a product of targeting by other inmates due

to his 21 U.S.C. § 848 "kingpin" conviction, and that he engaged in violence as a "childish" form

of self-defense. Palmer Letter (Oct. 6, 2019) at 1.

Since 2004, Palmer has been sanctioned for 2 incidents involving violence. In 2010, while

at USP Lewisburg, he received a fighting infraction, though Palmer insisted at the time that he and

the other inmate were merely engaging in "horseplay." Palmer Disciplinary Rep. at 1. Nine years later, Palmer was involved in another fight at USP Allenwood. *Id.* Palmer's only other disciplinary incidents in the last 20 years were misusing authorized medication and falsifying a statement (in 2019) and refusing a work assignment (in 2021). *Id.* Palmer insists that the "disciplinary incidents at issue here are simply not reflective" of his overall post-sentencing conduct nor his potential behavior post-release. Def.'s Suppl. on Remand at 15. The government finds Palmer's disciplinary history "troubling" but concludes that "his conduct appears to have improved as his incarceration progressed." Gov't Opp'n on Remand at 21.

After considering Palmer's disciplinary history in the context of his other conduct, the Court agrees with both parties that Palmer's conduct has improved considerably while incarcerated and that the handful of incidents involving violence are not representative of Palmer's current behavior. All of Palmer's infractions for violence, with the exception of the 2019 incident, occurred prior to Palmer's participation in the intensive drug rehabilitation, anti-violence Challenge program, and suicide watch teams. This indicates that the programs had a positive impact on Palmer and his relationships with other inmates. The Bureau of Prisons does not appear to view his behavior as particularly worrisome, as he is still permitted to participate in the special programming. *See* Palmer Letter (June 13, 2022) at 4. And the glowing commendations from prison officials at a variety of institutions who praise Palmer's adherence to orders and respect for the requirements set out by prison officials takes the edge off of the infractions. *See, e.g.*, Mitchell Rep.; Seiler Mem.; Hummel Mem.

Additional evidence presented by Palmer supports his contention that his disciplinary record alone does not accurately describe his post-sentencing conduct. While the Court does not condone violence in any forum, the Court is not immune to the particular physical dangers that

inmates face. For example, in August 2022, a unknown individual apparently under the influence of a synthetic cannabinoid attacked Palmer without provocation while Palmer was using the prison telephone. Def.'s Reply on Remand at 5. The individual "stabbed [Palmer] with a metal object" multiple times in his neck and back. Palmer Hosp. Rep. (Aug. 9, 2022), ECF No. 559-1, at 1. Palmer's injuries required treatment at an outside facility. *See id.*; Def.'s Reply on Remand at 4–5. The brutality and unpredictability of the incident indicates that Palmer's previous, but since reformed, tendency to "respond to every bit of aggression" at the beginning of his incarceration was perhaps understandable, though decidedly unacceptable. Palmer Letter (June 13, 2022) at 3; Palmer Letter (Oct. 6, 2019) at 2.

Palmer's remarkable post-sentencing educational, personal, spiritual, and programmatic development, as well as his close commitment to building positive relationships with others, are all factors weighing strongly in favor of a sentence reduction. Furthermore, Palmer's relatively sparse, and predominantly early, disciplinary history convinces the Court that 34 years is the most appropriate sentence given his post-sentencing record as a whole.

### d. *Need to Avoid Unwarranted Sentence Disparities*

A sentence reduction for Palmer is additionally appropriate to maintain consistency with the sentences—and subsequent sentence reductions—of his four co-defendants.

Following their convictions, Palmer and all but one of his co-defendants received life sentences for their participation in the conspiracy. Specifically, Palmer, Lamar Harris, Richard Smith, and Gary Wyche were all originally sentenced to life, and Donald Johnson was originally sentenced to 27 years. *See Palmer IV*, 35 F.4th at 846; *Wyche*, 741 F.3d at 1287; *United States v. Harris*, 258 F. Supp. 3d 137, 138 (D.D.C. 2017); *See* Order, *United States v. Johnson*, No. 89-cr-36-6 (RMU) (D.D.C. Oct. 22, 2008), ECF No. 311, at 1. Harris was Palmer's "right-hand man," as well as "a major figure in the drug distribution ring" who "personally used guns and actual

violence to further his business," including one time where he "was going to shoot somebody, but the gun jammed," and, during a separate incident, likely "placed [an] uzi in the mouth" of a woman because she permitted rival dealers to use her apartment. Mem. Op. & Order, *United States v. Harris*, No. 89-cr-36-2 (BAH) (D.D.C. July 7, 2017), ECF No. 460, at 2. Smith and Wyche were "principal lieutenants" of the organization. *See Wyche*, 741 F.3d at 1290. Johnson was a teenage participant in the organization. *See* Mot. to Reduce, *Johnson*, ECF No. 307, at 1.

All four moved for, and received, sentence reductions based on intervening changes in law. Johnson's sentenced was reduced to approximately 259 months, or approximately 21.5 years. Order, *Johnson*, ECF No. 311. Harris had his sentence reduced to 325 months, or just over 27 years. *See* Order, *Harris*, ECF No. 319. Smith's sentence was reduced to 31 years. *See* Order, *United States v. Smith*, No. 89-cr-36-3 (ESH) (D.D.C. March 31, 2016), ECF No. 440. And this Court recently reduced Wyche's sentence to 28 years pursuant to the First Step Act. *United States v. Wyche,* Case No. 89-cr-36-5 (RCL), 2023 WL 130825 at *1 (D.D.C. Jan. 9, 2023).

Palmer's increased culpability in the conspiracy as its "kingpin," evidenced by the more significant charges of which he was found guilty, necessarily means that a sentence reduction below that of his co-defendants is untenable. *Cf. Harris*, 959 F.2d at 249. But Palmer has already served more time in prison than any of his co-defendants, and he is the only one currently still in federal custody.[17] Leaving Palmer's life sentence without parole undisturbed—and thus the potential for Palmer to serve several more decades in prison—would create an unwarranted sentencing disparity between him and his co-defendants.

Similarly, the government's recommendation of a sentence reduction from life to 45 years' incarceration is inconsistent with First Step Act sentence reductions given to defendants

---

[17] Even with the reduction of Wyche's sentence resulting in his immediate release from federal custody, Wyche faced a consecutive state sentence in Maryland. *See Wyche*, 2023 WL 130825 at *3.

involved in other large-scale drug conspiracies in this District. Antone White, Eric Hicks, Kevin Williams-Davis, and McKinley Board were all originally sentenced to life imprisonment for participating in illegal drug distribution rings in Washington, D.C.[18] *See White*, 2022 WL 3646614 at \*4–5; Mot. to Reduce Sentence, *United States v. Williams-Davis*, No. 91-cr-559-1 (TFH), ECF No. 2365, at 13–14; Mot. to Reduce Sentence, *United States v. Board*, No. 91-cr-559-11 (TFH), ECF No. 2331, at 8–9. Those operations engaged in violent activity, including murder. *See White*, 2022 WL 3646614 at \*13–14; *United States v. Williams-Davis*, 90 F.3d 490, 493–94 (D.C. Cir. 1996). Yet, consistent with the text and purpose of the First Step Act, along with a consideration of the reduced statutory penalties and the 18 U.S.C. § 3553(a) sentencing factors, the sentences of all four defendants were reduced. The Honorable Beryl A. Howell reduced White's and Hicks's original life sentences to 35 and 33 years, respectively, *see White*, 2022 WL 3646614 at \*12–14, and the Honorable Thomas F. Hogan reduced Williams-Davis's and Board's original life sentences to approximately 30 years and 28 years, respectively. *See* Order, *Williams-Davis*, ECF No. 2376; Order, *Board*, ECF No. 2344.

Palmer's criminal activity, though serious, differed in important ways from the other defendants. Williams-Davis's and Board's organization, the R Street Crew, operated approximately four times longer than Palmer's conspiracy and trafficked 650 kilograms of cocaine, or more than four times the quantity of illegal drugs as Palmer's organization. *Williams-Davis*, 90 F.3d at 494. Williams-Davis personally participated in multiple shootings and a jury convicted him of two counts of second-degree murder. *Id.* Evidence at Palmer's trial established that his organization discharged weapons to intimidate civilians and rival gangs, but Palmer was not charged with or convicted of any kind of murder. Additionally, White's and Hicks's organization,

---

[18] In fact, Palmer and Williams-Davis were the first defendants in this District to be convicted and sentenced to life imprisonment for violating 21 U.S.C. § 848(b). *See* Def.'s Suppl. on Remand at 22.

the First Street Crew, operated for approximately twice as long as Palmer's organization but only distributed 21 kilograms of crack cocaine, about one-seventh the quantity of Palmer's organization. *White*, 2022 WL 3646614 at *1–2. However, the First Street Crew employed violent obstructive conduct. *Compare id.* at *1, 3, 22–24 (noting that the First Street Crew was implicated in the bribing of a grand jury witness and the murder of a confidential informant), *with* Gov't Opp'n on Remand at 3–4 (citing PSR ¶¶ 20, 36) (Palmer just instructed a potential witness not to speak with law enforcement).

Moreover, Palmer's case shares many of the factors that Chief Judge Howell and Judge Hogan looked favorably upon when granting previous sentence reductions. Like Williams-Davis, prison officials have praised Palmer's behavior while incarcerated. *See* Gov't Opp'n on Remand at 19 (citing *White*, 2022 WL 3646614 at *22). Like Board, Palmer's disciplinary record over the last 20 years is minimal. *See id.* at 20 (citing *White*, 2022 WL 3646614 at *22). Like Hicks, Palmer obtained professional certifications, increasing his post-release employment prospects. *See id.* (citing *White*, 2022 WL 3646614 at *18–19). Finally, like White, the fact that Palmer "maintained strong bonds with family and friends, mentored fellow inmates, and completed a significant number of classes" outweighed a handful of disciplinary infractions involving violence. *Id.* at 19 (citing *White*, 2022 WL 3646614 at *18–19).

After comparing Palmer's criminal activity and post-sentencing conduct to White, Hicks, Williams-Davis, and Board, the Court sees no basis for the government's recommendation of 45 years. On the contrary, a sentence of 34 years is merely one year less than White's reduced sentence (35 years), yet, White's record involved murder to further his drug enterprise. Therefore, the Court is confident that 34 years is the appropriate sentence for Palmer.

\*     \*     \*

That the First Step Act affords defendants the opportunity for a sentence reduction does not mean they are entitled to one. Rather, the Act "provides a powerful incentive for good behavior during long terms of incarceration, making clear that meaningful rehabilitation is a prisoner's best chance at obtaining a second chance at living a law-abiding life." *United States v. Russo*, Nos. 92-cr-351, 90-cr-1063 (FB) __ F. Supp. 3d. __, 2022 WL 17247005 at *12 (E.D.N.Y. Nov. 28, 2022). Palmer's post-sentencing conduct, demonstrated through his own words and actions, as well as letters from scores of supporters and additional documentary evidence, exemplifies the type of rehabilitation deserving of a sentence reduction.

## IV.  CONCLUSION

Following the Circuit's instructions on remand, this Court has determined that Palmer is eligible for a reduced sentence under § 404 of the First Step Act and that the Court will exercise its discretion to reduce Palmer's sentence. A separate Order shall issue.[19]

SIGNED this ___27th___ day of February, 2023.

_____
Royce C. Lamberth
United States District Judge

---

[19] Because a reduction in Palmer's sentence to time served will result in his imminent release, the government requests that the Court stay its sentence-reduction order for 3 calendar days to allow the Bureau of Prisons sufficient time to: (1) review whether Palmer should be subject to additional civil commitment or reporting requirements due to potential sexual misconduct; (2) collect a DNA sample from Palmer; and (3) inform Palmer of his obligations while on supervised release. *See* Gov't Opp'n on Remand at 22 n.9 (citing 18 U.S.C. §§ 3771, 4042(b) & (c), 4248, and 42 U.S.C. § 14135a). The Court is skeptical of the government's request, particularly because the government has not raised any allegations of sexual misconduct by Palmer nor indicated that Palmer (or his counsel) is unaware of his supervised-release conditions. Nevertheless, because the defense's filings do not respond to the government's contention, and because other courts in this District have consented to similar brief stays, the Court will acquiesce to the government's request. *See United States v. Wright*, 549 F. Supp. 3d 122, 127 (D.D.C. 2021); *United States v. Mitchell*, Crim. No. 05-00110 (EGS), 2019 WL 2647571 at *9 (D.D.C. June 27, 2019).